IN THE UNITED STATES COURT OF FEDERAL CLAIMS
(BID PROTEST)

| | |
|---|---|
| LEIDOS, INC., <br><br> Plaintiff <br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | Case No. _____ <br> Judge _____ <br><br> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |

**COMPLAINT**
**(Declaratory and Injunctive Relief)[1]**

Plaintiff, Leidos, Inc. (Leidos), respectfully brings this action against the Defendant United States of America, acting through the United States Department of Energy, Office of Headquarters Procurement Services (MA-64), Office of the Chief Information Officer (Agency), and alleges the following:

**NATURE OF THE CASE**

1. Leidos protests the Agency's decision to award a blanket purchase agreement (BPA) for Chief Information Officer Business Operations Support Services (CBOSS) 2.0 to Accenture Federal Services LLC (Accenture) under Solicitation No. 89303024RIM000008. Through the CBOSS 2.0 BPA, the Agency is seeking to increase its user capacity, improve flexibility, reduce redundant infrastructure, and enhance innovation. Given the importance of this

---

[1] Leidos is not currently seeking a preliminary injunction but reserves the right to do so.

requirement, the Agency committed to weighing the technical evaluation criteria more heavily than price in the award decision.

2. The Agency awarded to Accenture because  —and it offered an Outstanding technical approach ████████████████████████ The award decision, however, failed to consider the implications of why ████████████████████████

3. Accenture's price reflects that it significantly underestimated the level of effort required to perform a Sample Order. Under the terms of the Solicitation and the FAR, the Agency was required to consider whether the proposed level of effort was "misstated" and created performance risk. Yet, instead of rationally performing that required evaluation, the Agency simply brushed aside the risk associated with Accenture's understated level of effort because it concluded that Accenture's technical approach was Outstanding. That is inconsistent with the Solicitation, which required the Agency to separately evaluate the risk associated with an offeror's understated level of effort.

4. Had the Agency evaluated Accenture's proposal consistent with the terms of the Solicitation, it would have recognized that Accenture's low level of effort creates significant risk and assigned Accenture a technical rating of Marginal or Unacceptable.

5. For these reasons, Leidos respectfully seeks: (a) a declaratory judgment that the Agency's decision to award to Accenture was arbitrary, capricious, and otherwise contrary to law; (b) entry of an order enjoining the Agency from authorizing performance under the improper award; and (c) entry of an order directing the Agency to re-evaluate quotations in accordance with the Solicitation and applicable law.

## PARTIES

6. Plaintiff, Leidos, is a Virginia corporation with its principal place of business located at 1750 Presidents St., Reston, VA, 20190.

7. Defendant is the United States of America, acting through the Department of Energy, Office of Headquarters Procurement Services (MA-64). The Contracting Officers for the Agency responsible for this procurement are William Diggs, Jr., and John Maxwell.

## JURISDICTION

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(b)(1).

## STANDING

9. Leidos is an "interested party" with standing to file this action because Leidos is an actual offeror in the competition that, but for the errors made by the Agency in evaluating Leidos' proposal, would have had a substantial chance of receiving an award.

## FACTUAL BACKGROUND

**The Solicitation**

10. The Agency issued Solicitation No. 89303024RIM000008 (the Solicitation) under the General Services Administration (GSA) Multiple Award Schedule (MAS) using the procedures under FAR 8.405-3.

11. Through the Solicitation, the Agency sought to acquire a "scalable IT solution to support operations and maintenance of DOE's existing Government-owned and Government-managed IT hardware and software infrastructure, while also enabling OCIO's gradual transition to a managed service model to further align DOE's IT infrastructure with the latest proven technologies and industry best practices." Ex. 1, RFQ at 7.

12. Central to the scope of this procurement is innovation and the provision of cutting-edge, modern IT services and solutions to mitigate risk, as the contract is aimed at "leveraging emerging technologies" to "strengthen[] the overall security of the DOE's IT environment . . . while supporting compliance with all existing and future Government Mandates" and "establishing optimization, integration, and modernization [to] facilitate the delivery of IT support services to OCIO and its mission partners" throughout DOE's enterprise. Ex. 2, Att. A, CBOSS 2.0 SOW at PDF 4.

13. Through the CBOSS 2.0 vehicle, DOE's OCIO will outsource DOE's IT lifecycle to a qualified, innovative IT service provider to provide "a substantial portion of these services to Enterprise customers using a cost-recovery model and must therefore maintain accurate cost-tracking when outsourcing these IT services" across DOE's enterprise. *Id.* Accordingly, the Agency sought a contractor with a "high level of quality in its end user support services and all underlying IT operations, cost management, and maintenance activities," and "an efficient procurement management process with the capability to support, at a minimum, $60 million a year of Direct Material purchases using an automated Service Now tool." *Id.* at PDF 5, 9.

14. The Solicitation contemplated the award of a single-award Blanket Purchase Agreement (BPA) against which the Agency would issue BPA Orders that are Firm-Fixed-Price (FFP), Time-and-Materials (T&M), Labor-Hour (LH), or a combination of these types. Ex. 1 at 4. The period of performance was one base year and six option years, with a final option to extend performance for up to six months after the last exercised option year. *Id.* The Agency estimated that throughout performance, it would issue Orders valued at approximately $3.5 billion. *Id.* at 3.

15. The Solicitation established a "preference for a CTA" that could leverage a "broad spectrum of complimentary technical expertise, enhanced solution integration, risk mitigation," and allow for "expedited BPA order execution." *Id.* at 5; Ex. 2 at PDF 4.

### The Solicitation's Instructions and Evaluation Criteria

16. The Solicitation required the Agency to award to the offeror whose "quotation meets the Government's requirements and whose technical and price quotation represents the best value to the Government." Ex. 1 at 95. The Solicitation provided the following evaluation criteria, listed in "descending order of importance": Corporate Experience, Management Approach, Technical Approach, and Price. *Id.* The Solicitation "cautioned that the award may not necessarily be made to the lowest price quotation." *Id.* at 95-96.

17. The Solicitation required offerors to submit the following three volumes: 1) Technical Quotation; 2) Price Quote; and 3) Supporting Documentation. *Id.* at 87.

18. In Volume 1, Technical Quotation, the Solicitation directed offerors to address three criteria: 1) Corporate Experience; 2) Management Approach; and 3) Technical Approach. *Id.* at 87-95. The Solicitation stated that the Agency would evaluate the three criteria and assign an adjectival rating between Outstanding and Unacceptable based on the offeror's understanding of the requirements, the efficacy of the approach, and the risk associated with the proposed approach. *Id.* at 96.

19. For Corporate Experience, the Solicitation required offerors to "describe their recent corporate experience with projects of a similar size, scope, and complexity" from awards or contracts valued at $750 million or more, and to provide up to three examples that "demonstrate experience in the performance areas identified in the CBOSS 2.0 BPA Scope of Work." *Id.* at 88.

20. For the Management Approach, the Solicitation required offerors to "describe how the organization will manage all aspects of the CBOSS 2.0 BPA Scope of Work," and to provide a "plan to recruit and maintain an environment in which highly skilled and talented people will make long-term commitments over the duration of the CBOSS 2.0 BPA Scope of Work with an emphasis on key personnel positions, including incentives for employee performance and innovation." *Id*. at 90-91. The Agency would evaluate the offerors': 1) "approach to BPA-wide controls and integration to ensure strategic alignment" and "management controls and coordination tools that will be used to ensure the timely and successful completion of the activities"; 2) "customer-centric approach to managing resources while accommodating workload fluctuations and handling activities that may occur simultaneously"; and 3) "plan to recruit and maintain an environment in which highly skilled and talented people will make long-term commitments over the duration of the CBOSS 2.0 BPA Scope of Work with an emphasis on key personnel positions, including incentives for employee performance and innovation." *Id*. at 99.

21. Finally, for the Technical Approach, the Solicitation directed offerors to "detail[] their proposed customer-centric approach, techniques, and methodologies for accomplishing each of the task areas identified in Attachment B, ITIL Operation and Management Sample Order," and to "include in this discussion any resources, proven techniques, unique offerings, or any other technical information that demonstrates their technical understanding, organizational capability, and overall capacity to perform the solicitation requirements including any specialized knowledge of best practices and innovative approaches." *Id*. at 91. The Solicitation required the Agency to evaluate the offeror's "discussion of resources, proven techniques, unique offerings, . . . and

overall capacity to perform the requirements including any specialized knowledge of best practices and innovative approaches." *Id.*

22. For Volume 2, Price Quotation, the Solicitation required offerors to map the Government-provided labor categories to labor categories in the underlying GSA MAS contract, then provide a "single discount percentage off of all labor categories and rates." *Id.* Offerors were also instructed to provide "any proposed fees associated with direct materials purchasing support requirements (e.g., hardware, software, and other ODCs and products not available under MAS)." *Id.* at 92.

23. Offerors were also required to submit pricing data in response to the ITIL Operation and Management Sample Order. *Id.* The Solicitation directed offerors to "provide a narrative explanation or basis of estimate," propose their "fee/profit structure for direct materials purchasing in Attachment D, Labor Category Discount Spreadsheet," which would be broken down by period of performance and task and include labor categories, labor rates, and hours. *Id.*

24. In the narrative explanation, the Solicitation required offerors to "explain how the level of effort and labor mix is reasonable and commensurate to the tasks in the ITIL Operation and Management Sample Order,"—which the government estimated required a total of 2,742,235 hours—and prohibited offerors from providing "additional discounts for the ITIL Operation and Management Sample Order." *Id.* at 92-93.

25. The Agency would calculate each offeror's total price by adding the total fee/profit for the direct material purchasing to the total price for the Sample Order, including the base period, all four option periods, and "50% of the total price of Option Period 6." *Id.* at 101.

26. The Solicitation required the Agency to evaluate Price quotations "for compliance with the RFQ instructions, reasonableness, and completeness," using "any of the following methods in its price analysis to establish price reasonableness: (a) reviewing prices received in response to this RFQ for adequate price competition; or (b) comparing proposed prices to historical prices; or (c) comparing proposed prices to an Independent Government Cost Estimate; (d) comparing proposed prices to GSA's published price lists; or (e) comparing proposed prices to prices obtained through market research for the same or similar services or any combination of the above." *Id.* at 100. The Agency stated that it would not perform a price realism evaluation on proposed labor rates. *Id.*

27. The Agency was, however, required to evaluate the "level of effort and the labor mix proposed to perform the ITIL Operation and Management Sample Order." *Id.* Specifically, the Agency committed to considering whether the "proposed level of effort and labor mix is misestimated or presents risk to contract performance." *Id.*

28. When an offeror asked whether the government "will consider whether a [] proposed level of effort and labor mix is misestimated or presents risk to contract performance. . . when evaluating Factor 3, Technical Approach," the Agency responded: "Yes, the government will evaluate the labor mix and level of effort as it relates to the Technical Approach submitted for Criterion 3." Ex. 3, Am. 2 Q&A #71.

**Notice of Award**

29. On January 17, 2025, the Agency notified Leidos that it was not selected for award. Ex. 4, Brief Explanation at 1. The notice identified Accenture Federal Services LLC (Accenture) as the awardee, and provided Leidos and Accenture's technical ratings and total proposed price:

| Quoter | Corporate Experience | Management Approach | Technical Approach | Price |
|---|---|---|---|---|
| Leidos | ▓ | ▓ | ▓ | ▓ |
| Accenture | Outstanding | Outstanding | Outstanding | $96,425,597.51 |

*Id.* at 2.

30. The Agency also provided Leidos a copy of its technical evaluation, which showed that Leidos received a ▓ ▓ Ex. 5, Technical Evaluation.

31. For Corporate Experience, Leidos received ▓ ▓ which the Agency found ▓ ▓ *Id* at 98, 101.

32. Leidos also ▓ for its ▓ ▓ *Id.* at 101-02. Again, the Agency found that Leidos' ▓ ▓ *Id.* at 103.

33. For its Management Approach, Leidos received ▓ ▓. The Agency assigned Leidos ▓ *Id.* at 105. Leidos also ▓ ▓

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *Id.* at 106-07. Finally, the Agency assigned Leidos' Technical Approach ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at 110-17.

34. On January 23, 2025, the Agency provided Leidos a redacted version of the Source Selection Decision Document (SSDD). Ex. 6, SSDD. The SSDD indicated that the TEC found Leidos ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *id.* at 8, while Accenture was the "second strongest of [REDACTED] quotes, ▇▇▇▇▇▇ [REDACTED]." *Id.* at 14.

35. The Agency found that Leidos was ▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇ For Criteria 1, the Agency concluded that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ which the TEC found to be a ▇▇▇▇▇▇▇ that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *Id.* at 20 (emphasis added).

36. For Criteria 3, the Agency ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The SSDD noted that both Accenture and Leidos ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ but found that Leidos ▇▇▇▇▇▇▇

███████████████████████████████████

███████████████████████. *Id.* at 20-21.

37.In summarizing the price evaluation, the Agency stated that it evaluated the proposed levels of effort and labor mixes. *Id.* at 25. The Agency generally "concluded that all Quotes proposed levels of effort and labor mixes commensurate with their unique technical approaches, though with varying degrees of risk." *Id.* The Agency appears to have then ignored risk associated with Accenture's low level of effort because it received an Outstanding rating "across all criteria [which] demonstrates a technically sound proposal with no significant risks." *Id.* at 26.

38.In conducting the tradeoff, the Agency noted the █████████████ between the offerors and stated that one of the reasons for the ████████████ █████████████████ was that Accenture proposed fewer total hours for the Sample Order ████████. *Id.* at 30. For the ITIL Operation and Management Sample Order, the SSDD indicated that there was over a ██████████ between the total labor prices proposed by Accenture—the lowest priced quoter—and Leidos████████ ████. *Id.* at 23.

39.The SSDD did not, however, appears to not have considered the "varying degrees of risk" associated with Accenture's low price, despite identifying that in the price evaluation. *Id.* at 25.

40.The Agency ultimately asserted that the ████████████████████ █████████████ were ████████████████████ and that Accenture's ████████████████████ warranted award:

███████████████████████████



*Id.* at 32.

## COUNT I

### The Agency Failed to Evaluate Quotes Consistent with FAR 8.405-3 and the Solicitation

41.     Leidos incorporates by reference the preceding paragraphs as if they were set forth fully in this section.

42.     A contracting agency must evaluate quotes in accordance with the terms of the Solicitation and law.  The award decision shows that the Agency failed to reasonably evaluate Accenture's proposed level of effort and labor mix for the Sample Order.

43.     Under Evaluation Criterion 4 – Price, the Solicitation required the Agency to "consider the level of effort and the labor mix proposed to perform the ITIL Operation and Management Sample Order." *Id.* at 100.  This consideration was to include "whether a Quoter's proposed level of effort and labor mix is misestimated or presents risk to contract performance." *Id.*  In pre-proposal questions and answers, the Agency confirmed that it would perform this risk evaluation as part of the evaluation of Criterion 3, Technical Approach.  Ex. 3 at #71.

44.     This analysis was required not only by the Solicitation, but also by the FAR.  The Solicitation was issued using FAR Part 8 procedures, and provided that the Agency anticipated "awarding a single-award BPA in accordance with the Federal Acquisition Regulation (FAR)

8.405-3." Ex. 1 at 3. According to FAR 8.405-3(b)(2)(vi), when establishing a BPA for services that require a statement of work, "[t]he ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform" the effort. FAR 8.405-3; *see also Trillion ERP Venture Tech LLC v. United States*, 161 Fed. Cl. 531, 552 (2022) ("Under FAR subpart 8.4, a contracting officer is 'responsible for considering the level of effort and the mix of labor proposed to perform, and for determining that the proposed price is reasonable.'").

45. There is no evidence that the Agency rationally performed these required analyses when evaluating Accenture's proposal to perform the Sample Order. To the extent it did perform such an analysis, any conclusion that Accenture's approach did not pose substantial risk was irrational.

46. Accenture's total evaluated price of $96,425,597.51 was nearly ▮▮▮ Leidos' total evaluated price. See Ex. 4 at 2; Ex. 6 at 32. As the Agency appears to have acknowledged in the SSDD, one of the reasons for this ▮▮▮ was that Accenture proposed ▮▮▮ hours for the Sample Order. Ex. 6 at 30.

47. For the Sample Order, Leidos proposed an approach that ▮▮▮
▮▮▮
▮▮▮
▮▮▮ *See* Leidos Prop. Vol. 2, Attach. D, Total Evaluated Price Tab.

48. According to the redacted SSDD, Accenture ▮▮▮
▮▮▮
▮▮▮ Ex. 6 at 20. Nonetheless, the

Agency still concluded that ████████████████████████ ████████████████████████████████████████████ *Id.* at 21.

49. Given that Accenture ████████████████  ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████ *Id.* at 30.

50. The Agency did not rationally evaluate Accenture's low proposed level of effort. In evaluating offerors' proposed level of effort, the Agency "concluded that all Quotes proposed levels of effort and labor mixes commensurate with their unique technical approaches, though with varying degrees of risk." *Id.* at 25.

51. The Agency apparently ignored the "varying degrees of risk"—including the higher risk associated with Accenture's underestimated level of effort—simply because Accenture's technical proposal was evaluated as Outstanding. *Id.* at 26. Indeed, nowhere in the actual tradeoff does the Agency reference or rationally assess the "varying degrees of risk" associated with Accenture's and Leidos' proposals.

52. The Agency's circular logic is insufficient to comply with the Solicitation and the law. Again, the Solicitation required the Agency to evaluate the proposed level of effort and labor mix and to consider any risk presented by a "misestimated" level of effort in the technical evaluation. Ex. 1 at 100; Ex. 3 at #71. The fact that an offeror proposed an otherwise low-risk technical approach does not mean that an understated level of effort does not create risk, as the Agency apparently thinks it does. Rather, the Solicitation required the Agency to separately

evaluate the risk associated with the proposed level of effort and incorporate that risk into the technical evaluation and award decision. The Agency did not do so here.

53. Had the Agency rationally evaluated the levels of effort in Accenture's quote, it would have found that Accenture's proposed level of effort—which was necessarily significantly below ▮ the Government's estimate ▮ ▮ created significant risk. That risk should have resulted in a Marginal or Unacceptable rating under Criterion 3, Technical Approach. *See* Ex. 1 at 98 (defining a Marginal quote as one that has "significant risk" and an Unacceptable quote as one that has an "unacceptable level of risk"). Instead, the Agency awarded to an offeror whose ▮ demonstrates that it did not propose an adequate level of effort and labor mix to successfully perform the sample order and BPA. As a result, the Agency failed to evaluate offerors consistent with FAR 8.405-3 and the Solicitation. Thus, the Agency's evaluation and resulting award were improper. *See HWI Gear, Inc. v. United States,* 151 Fed. Cl. 668, 677 (2020) (granting plaintiff's motion for judgment on the administrative record where "the agency failed to comply with the terms of its solicitation."); *see also Ernst & Young, LLP v. United States,* 136 Fed. Cl. 475, 515 (2018) (sustaining protest count where the agency's evaluation "violated FAR 8.405–3(b)(2)(vi)" and "was not consistent with the requirements outlined in the MAHSO Solicitation.").

## COUNT II

### The Agency's Best Value Determination Was Flawed

54. Leidos incorporates by reference the preceding paragraphs as if they were set forth fully in this section.

55. As explained in Count I, the Agency failed to appropriately consider the risk associated with Accenture's low price despite noting in its price evaluation that "all Quotes proposed levels of effort and labor mixes commensurate with their unique technical approaches, though with varying degrees of risk." Ex. 6, SSDD at 25. Had the Agency considered the significant risk created by Accenture's low price, the result of a low level of effort, it would have rated Accenture either Marginal or Unacceptable under Criterion 3, Technical Approach. This necessarily would have altered the Agency's best value determination, as the Agency selected Accenture for award because it believed Accenture proposed a "solid and comprehensive Technical Approach and can successfully perform the requirement." *Id.* at 32.

56. Because the Agency failed to properly consider the risk associated with Accenture's quote, resulting in an arbitrary rating of Accenture's quote under Criterion 3, Technical Approach, the Agency's subsequent best value determination was likewise arbitrary and capricious. *See BayFirst Sols., LLC v. United States*, 102 Fed. Cl. 677, 695 (2012) ("Because the ratings that provided the basis for the Agency's tradeoff analysis and best value award were fundamentally flawed and arbitrary, the best value award itself was arbitrary and capricious.").

## REQUEST FOR INJUNCTIVE RELIEF

Leidos is entitled to permanent injunctive relief because it satisfies the four requirements for the Court to grant injunctive relief. *First*, Leidos is likely to succeed on the merits because it has demonstrated the Agency failed to evaluate Accenture's quote in accordance with the FAR and Solicitation.

*Second*, Leidos will be irreparably harmed without injunctive relief. If the Agency and Accenture are allowed to perform the BPA, Leidos will lose the opportunity to receive and perform

a contract it had a substantial chance of being awarded █████████████████ but for the Agency's evaluation that deviated from the requirements of the FAR and Solicitation.

*Third*, the balance of hardships favors injunctive relief. Without injunctive relief, Leidos will be deprived of the fair opportunity to receive and perform the BPA, resulting in a substantial loss of revenue. In contrast, injunctive relief will not harm the Agency, who will still be able to receive the services from the incumbent contract while performing an evaluation consistent with the terms of the Solicitation.

*Fourth*, the public interest weighs in favor of injunctive relief because the public has an interest in the integrity of the procurement system and agencies following the law and solicitation requirements when evaluating responses to a solicitation.

## PRAYER FOR RELIEF

WHEREFORE, Leidos respectfully requests that the Court grant the following relief:

a) A declaratory judgment finding that the Agency's evaluation of quotes and decision to award the BPA to Accenture was arbitrary, capricious, and otherwise contrary to law;

b) A permanent injunction prohibiting the Agency from proceeding with performance of the BPA it improperly awarded to Accenture;

c) An order directing the Agency to re-evaluate quotations in accordance with the Solicitation and applicable law; and

d) An order granting any other relief that the Court deems necessary, just, and proper.

Respectfully submitted,

s/ Paul F. Khoury
Paul F. Khoury
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
pkhoury@wiley.law
Phone: (202) 719-7346
Facsimile: (202) 719-7049

*Counsel of Record for Leidos, Inc.*

*Of counsel:*
Cara L. Sizemore
W. Benjamin Phillips, III
Vaibhavi Patria
WILEY REIN LLP

Dated: January 29, 2025